1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   James River Insurance Company,                 No. CV-20-01052-PHX-DGC

10              Plaintiff/Counterdefendant,          **ORDER**

11  v.

12  Wendee Thompson, et. al,

13              Defendants/Counterclaimants.

14

15

16          The parties dispute the scope of Phase 1 discovery in this case.  The issues are fully

17  briefed.  Docs. 72-75.  This order resolves the dispute.

18  **I.      Background.**

19          Plaintiff James River Insurance Company issued a medical professional insurance

20  policy to Dr. Phillip Gear and Just for Kids, P.L.C.  Wendee Thompson and her parents,

21  Joseph and Mildred, sued Dr. Gear and Just for Kids in state court, asserting medical

22  malpractice claims based on Dr. Gear's alleged failure to diagnose and provide appropriate

23  care for Wendee's pregnancy, which resulted from sexual abuse at a long-term care facility.

24  *See Thompson v. Gear*, No. CV2019-057584 (Maricopa Cty. Super. Ct. Dec. 24, 2019).

25          Plaintiff brought this declaratory judgment action against Dr. Gear and Just for Kids

26  to establish that there is no coverage for the Thompsons' state court tort claims.  Doc. 1.

27  Plaintiff added a recission claim in its amended complaint.  Doc. 56.  The Court allowed

28  the Thompsons to intervene as Defendants after they dismissed Just for Kids from the state

1    court case and Dr. Gear assigned to the Thompsons his rights under the policy pursuant to

2    a *Morris* agreement.  Docs. 15, 17, 24; *see United Servs. Auto. Ass'n v. Morris*, 741 P.2d

3    246 (Ariz. 1987).[1]  Defendants have filed counterclaims for declaratory relief, breach of

4    contract, and bad faith.  Docs. 26, 60.

5          In July 2021, the Court entered a case management order governing Phase 1 of the

6    litigation, which is limited to coverage issues raised in the complaint and counterclaims.

7    Doc. 65.[2]  On August 23, 2021, the parties informed the Court that they had a dispute

8    regarding the scope of Phase 1 discovery.  Doc. 68.  A telephone conference was held on

9    September 1.  Doc. 71.  The Court directed the parties to file memoranda addressing:

10   (1) what evidence a court may consider in deciding what is covered by an insurance policy;

11   (2) what additional information the reasonable expectations doctrine makes available for a

12   court to consider in deciding coverage issues; and (3) what additional information a court

13   may consider when a policy provision is ambiguous.  *Id.*  The parties have filed their

14   respective memoranda and response briefs.  Docs. 72-75.

15   **II.    Discussion.**

16         Plaintiff alleges in count one that a "sexual act" exclusion in the policy bars

17   coverage for the tort claim against Dr. Gear.  Doc. 56 ¶¶ 31-35.  That exclusion states that

18   the policy does not apply to any claim:

19   > Based on or directly or indirectly arising out of or resulting from any sexual
20   > act or acts including but not limited to undue familiarity, excessive influence
     > or power, molestation, assault, battery or harassment, including "claims" of
21   > improper or negligent hiring, employment or supervision, failure to protect
     > or warn the other party, failure to prevent the sexual abuse and/or physical
22   > abuse, failure to prevent assault and battery and failure to discharge the
23   > employee[.]

24

25         [1] When Plaintiff refused to settle Defendants' tort claims for the $1 million policy
26   limit, Dr. Gear settled with Defendants and agreed to the entry of a $15 million judgment.
     The state court has found the $15 million to be a reasonable settlement amount.  *See* Docs.
27   64 at 5, 72 at 2.

28         [2] If a finding of coverage is made during Phase 1, Phase 2 of the litigation will
     include Plaintiff's rescission claim and Defendants' bad faith claim and request for punitive
     damages.  *See* Doc. 64 at 10.

2

1   *Id.* ¶ 29 (quoting policy § I.2.e).   Plaintiff alleges that this sexual act exclusion bars

2   coverage for the claim against Dr. Gear because that claim is based on, directly or indirectly

3   arises out of, or results from the sexual assault of Wendee Thompson.   *Id.* ¶ 34; *see id.*

4   ¶¶ 19-23; Doc. 60 at 57-58.

5        Defendants dispute that the tort claim against Dr. Gear arises from "sexual assault."

6   Doc. 75 at 5.   Defendants contend that the sexual act exclusion does not bar coverage

7   because Dr. Gear never sexually assaulted Wendee and the claim against him alleges only

8   medical malpractice – his failure to diagnose Wendee's pregnancy and to provide her

9   prenatal and other appropriate medical care.   *Id.*; *see also* Docs. 60 at 6-7, 19-25; 64 at 6;

10   72 at 2.

11        Defendants have served discovery requests on Plaintiff that seek information and

12   documents concerning the policy and the sexual act exclusion, including drafting histories,

13   claims manuals and files, and underwriting materials.   *See* Doc. 72 at 132-57.   Specifically,

14   Defendants seek information on when and why the exclusion was drafted, how it has been

15   applied to other claims and interpreted internally, and what was said between Plaintiff and

16   Dr. Gear (who is now deceased) about the meaning of the exclusion or the scope of

17   coverage.   *See id.*   Defendants argue that the information sought is relevant to coverage

18   issues and discoverable under Arizona law and Federal Rule of Civil Procedure 26(b)(1).

19   *Id.* at 3-10.

20        Plaintiff contends that discovery of extrinsic evidence is not appropriate because the

21   only facts relevant to a coverage determination are the policy itself and the underlying

22   complaint.   Doc. 73 at 1-2.   Plaintiff believes the case should proceed directly to summary

23   judgment on the coverage issue with no discovery allowed during Phase 1.   *Id.* at 2.

24        **A.      The Court May Consider Extrinsic Evidence in Deciding What Is**
            **Covered by the Policy.**

25

26        In Arizona, courts should interpret and enforce insurance policies according to the

27   parties' intent.   *See Taylor v. State Farm Mut. Auto Ins.*, 854 P.2d 1134, 1138 (Ariz. 1993).

28   The court must decide what evidence, other than the policy itself, "is admissible in the

interpretation process, bearing in mind that the parol evidence rule prohibits extrinsic

1   evidence to vary or contradict, but not to interpret, the agreement." *Id.* (citing 3 Arthur L.

2   Corbin, *Corbin on Contracts* § 543, at 130-34 (1960)).   If, after considering relevant

3   extrinsic evidence, the court finds that the policy language "is 'reasonably susceptible' to

4   the interpretation asserted by its proponent, the evidence is admissible to determine the

5   meaning intended by the parties." *Id.* at 1140 (citing Restatement (Second) of Contracts

6   § 215 cmt. b (1979)); *see also Doneson v. Farmers Ins. Exch.*, 431 P.3d 198, 200 (Ariz. Ct.

7   App. 2018) (same, citing *Taylor*, 854 P.2d at 1140); *Smith v. Melson, Inc.*, 659 P.2d 1264,

8   1266 (1983) ("A contract should be read in light of the parties' intentions as reflected by

9   their language and in view of all the circumstances. . . .  When interpreting an agreement,

10  the court may always consider the surrounding circumstances.") (citing Restatement

11  § 212).

12         In holding that the parol evidence rule is not violated where extrinsic evidence is

13  used to interpret, not contradict, the policy language, the Arizona Supreme Court provided

14  this explanation:

15         The meaning that appears plain and unambiguous on the first reading of a
           document may not appear nearly so plain once the judge considers the
16         [extrinsic] evidence.  In such a case, the parol evidence rule is not violated
           because the evidence is not being offered to contradict or vary the meaning
17         of the agreement.  To the contrary, it is being offered to explain what the
18         parties truly may have intended.

19  *Taylor*, 854 P.2d at 1140 (noting that "this rule embodies the concepts endorsed by Corbin

20  and adopted by this court ten years ago in *Melson*"); *see also Darner Motor Sales, Inc. v.*

21  *Universal Underwriters Ins. Co.*, 682 P.2d 388, 395-96 (Ariz. 1984) (recognizing that

22  while the parol evidence rule precludes parties from varying the terms of an insurance

23  policy by introducing evidence contrary to the writing, the rule is not "strictly applied" to

24  enforce a bargain that was never made) (citations omitted); *Am. Nat. Fire Ins. Co. v.*

25  *Esquire Labs of Ariz., Inc.*, 694 P.2d 800, 811 (Ariz. Ct. App. 1984) (explaining that

26  "evidence on surrounding circumstances, including negotiation, prior understandings,

27  subsequent conduct and the like to determine the parties' intent . . . may be used to interpret

28  the meaning of the exclusion in the agreement"); *Keggi v. Northbrook Prop. & Cas. Ins.*

*Co.*, 13 P.3d 785, 788 (Ariz. Ct. App. 2000) ("[W]e will first attempt to discern the meaning of the clause 'by examining the purpose of the exclusion in question, the public policy considerations involved and the transaction as a whole.'") (citations omitted); *Maricopa Cty. v. Ariz. Prop. & Cas. Ins. Guar. Fund*, No. 2 CA-CV 98-0076, 2000 WL 35937314, at *1 (Ariz. Ct. App. Apr. 27, 2000) ("This appeal raises issues of interpretation and applicability of the 'pollution exclusion' in . . . insurance policies.  We conclude that, in ruling on those issues, the trial court erroneously refused to consider extrinsic evidence relating to the drafting history and regulatory approval of the exclusion."); *Federico v. Cont'l Cas. Co.*, 52 F.3d 332, 332 (9th Cir. 1995) ("According to Arizona law, a court may look to extrinsic evidence to determine the parties' intent in forming the contract. . . .  This rule applies whether the insured or the insurer is seeking to present the parol evidence.") (citing *Darner*, 682 P.2d at 398; *Esquire Labs*, 694 P.2d at 811); *Goldberg v. Pac. Indem. Co.*, No. CV05-2670-PHX-JAT, 2008 WL 508495, at *13 (D. Ariz. Feb. 21, 2008) (considering "extrinsic evidence put forth by Plaintiffs – Pacific's insurance manuals, testimony of Pacific's representatives, and expert testimony" – to interpret a coverage provision); *McCarthy v. Scottsdale Unified Sch. Dist. No. 48*, 409 F. Supp. 3d 789, 803 (D. Ariz. 2019) ("[T]he Court will interpret the [contract provision] by considering its language and extrinsic evidence concerning the parties' intent[.]") (citing *Taylor*, 854 P.2d at 1139); *Nammo Talley Inc. v. Allstate Ins. Co.*, 99 F. Supp. 3d 999, 1004 (D. Ariz. 2015) ("The *Taylor* court emphasized that, where appropriate, a judge should consider parol evidence to define contractual terms because a 'court's proper and primary function' is to enforce the meaning intended by the contracting parties.") (quoting *Taylor*, 854 P.2d at 1140).

Plaintiff asserts that Arizona courts generally apply the "eight corners" rule in determining whether coverage exists "as a matter of law" – that is, "the Court need only look at the 'four corners' of the policy and the 'four corners' of the complaint."  Doc. 73 at 3-4.  But the cases cited in support of this assertion primarily involve the duty to defend, not coverage issues.[3]  An insurer's duty to defend "is separate from and broader than its

_____

[3] *See id.* (citing *W. Nat'l Assurance Co. v. Wipf*, 702 F. App'x 542, 544 (9th Cir.

1    duty to indemnify, [and] generally arises if the complaint filed against the insured alleges

2    facts that fall within the policy's coverage."  *Teufel v. Am. Fam. Mut. Ins. Co.*, 419 P.3d

3    546, 548 (Ariz. 2018); *see Nat'l Fire Ins. Co. of Hartford v. James River Ins.*, 162 F. Supp.

4    3d 898, 913-14 (D. Ariz. 2016) ("The duty to defend . . . is distinguishable from the duty

5    to indemnify, and separate analysis of the duty to indemnify is necessary.") (citing *INA Ins.*

6    *Co. of N. Am. v. Valley Forge Ins. Co.*, 722 P.2d 975, 982 (Ariz. Ct. App. 1986)).  Plaintiff

7    cites no case applying the "eight corners" rule to a coverage determination, and Arizona

8    law clearly permits a court to consider relevant extrinsic evidence in interpreting policy

9    language.  *See Taylor*, 854 P.2d at 1139 ("To understand the agreement, the judge cannot

10   be restricted to the four corners of the document.  Again, even under the Corbin view, the

11   court can admit evidence for interpretation[.]").

12          Plaintiff repeatedly asserts that extrinsic evidence may not be considered in deciding

13   coverage "as a matter of law."  Doc. 73 at 2-7.  This is particularly true here, Plaintiff

14   contends, because "the parties agree on the facts to be applied to the policy (*i.e.*, the

15   allegations of the underlying complaint), the policy provisions are clear and unambiguous,

16   and [Defendants] have not even alleged 'ambiguity[.]'"  *Id.* at 2.  Plaintiff notes that the

17   parties "anticipate filing motions and cross-motions for summary judgment on the question

18   of whether Defendants' claim against Dr. Gear in the underlying action is covered by

19   the . . . policy ***as a matter of law***."  *Id.* at 3 (quoting Doc. 64 at 7) (emphasis added by

20   Plaintiff).

21   ───────────────

22   2017) (noting that under Washington law the "duty to defend is determined from the 'eight
     corners' of the insurance contract and the underlying complaint") (citation and alterations

23   omitted); *Truck Ins. Exch. v. Teixidor Enters. Inc.*, No. 1 CA-CV 20-0342, 2021 WL
     3733194, at *5 (Ariz. Ct. App. Aug. 24, 2021) ("In the third-party liability context, insurers

24   first look to the complaint. . . .  If any claim alleged in the complaint is within the policy's
     coverage, the insurer has a duty to defend the entire suit."); *Wesco Ins. Co. v. AAA Cab*

25   *Serv. Inc.*, 420 F. Supp. 3d 946, 950 (D. Ariz. 2019) ("Wesco has no duty to defend its
     insured in the Underlying Action because [the passenger's] death did not arise out of the

26   use of an automobile."); *United States Liab. Ins. Co. v. Xiangnan Gong*, 413 F. Supp. 3d
     987, 991 (D. Ariz. 2019) ("[I]n similar cases where an insurer sought a declaratory

27   judgment abdicating its duty to defend an insured party, precedent supports addressing a
     motion for summary judgment independent of the progress in the underlying lawsuit.");

28   *757BD LLC v. Nat'l Union Fire Ins. Co. of Pitt., PA*, 330 F. Supp. 3d 1143, 1152 (D. Ariz.
     2018) ("[B]ecause the lack of coverage was apparent from the allegations in the Complaint,
     there was no duty to defend based on these claims.")).

1    But Plaintiff does not explain why it agreed to a discovery period for Phase 1 (*see*

2    Doc. 64 at 9) if its position is that only the policy and underlying complaint may be

3    considered in determining coverage.  Defendants state that, while they anticipate the filing

4    of summary judgment motions on coverage issues, they did not agree to those issues being

5    decided in a factual void.  Doc. 75 at 1.  Indeed, Defendants made clear to Plaintiff that they

6    intend to conduct Phase 1 discovery regarding "the formulation, underwriting,

7    implementation, and interpretation of the exclusionary language at issue[.]"  Doc. 64 at 8.

8    Moreover, the fact that the parties will move for summary judgment on coverage

9    issues should not preclude Defendants from conducting discovery on the meaning and

10   application of the sexual act exclusion.  Were Defendants to discover extrinsic evidence

11   that helps explain the meaning of the exclusion, that evidence may be considered by the

12   Court and could demonstrate a triable issue.  *See Averett v. Farmers Ins. Co. of Ariz.*, 869

13   P.2d 505, 508 (Ariz. 1994) ("[W]e are of the view that the trial court should have permitted

14   a fact finder to decide if, based on all available evidence, the household exclusion in

15   Averett's policy was 'beyond the range of reasonable expectations.'") (quoting

16   Restatement § 211 cmt. f ); *Maricopa Cty.*, 2000 WL 35937314, at *2 ("Interpretation of

17   an insurance contract generally involves a matter of law . . . .  But when the policy language

18   in question, 'illuminated by the surrounding circumstances, indicates that either of the

19   interpretations offered is reasonable,' and when 'extrinsic evidence establishes controversy

20   over what occurred and what inferences to draw from the events, the matter is properly

21   submitted to the trier of fact.'") (quoting *Taylor*, 854 P.2d at 1145) (alterations omitted);

22   *Jacobson v. Am. Fam. Ins. Co.*, No. CV-17-04373-PHX-MTL, 2020 WL 919173, at *2 (D.

23   Ariz. Feb. 26, 2020) ("[T]he Court is . . . persuaded that while the actual terms of the policy

24   are undisputed, a jury should decide whether the policy should be reformed to be consistent

25   with Cathy Jacobson's alleged reasonable expectations.") (citing *Taylor*, 854 P.2d at 1145);

26   *U-Haul Int'l, Inc. v. Clarendon Am. Ins. Co.*, 381 F. App'x 735, 737 (9th Cir. 2010) ("We

27   agree . . . that if the extrinsic evidence showed that Clarendon's policy interpretation was

28   plausible, remand would be appropriate to allow a jury to resolve the disputed issue.")

(citing *Taylor*, 854 P.2d at 1140); *Federico*, 52 F.3d at 332 ("The extrinsic evidence that supports Federico's interpretation consists of his recollections and his assertions that he was told that the policy covered accidental injury as well as death.  CNA submitted evidence that he was not so informed.  That is enough to establish a genuine issue of material fact.  Therefore Federico was entitled to present his extrinsic evidence to the jury.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).

### B.     Arizona's Reasonable Expectations Doctrine.

In *Darner*, the Arizona Supreme Court "adopted § 211 of the Restatement as the test to determine whether standardized terms are within the reasonable expectations of the parties and therefore enforceable."  *Do by Minker v. Farmers Ins. Co. of Ariz.*, 828 P.2d 1254, 1256 (Ariz. Ct. App. 1991) (citing *Darner*, 682 P.2d at 396-97).  Under this doctrine, Arizona courts may consider not only the policy language, but also the insured's reasonable expectations of coverage.  *See id.*  The *Darner* court explained that "[w]here the other party has reason to believe that the party manifesting . . . assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement."  682 P.2d at 396 (quoting Restatement § 211(3)); *see also Hanover Ins. Co. v. Vemma Int'l Holdings Inc.*, No. CV-16-01071-PHX-JJT, 2016 WL 4059606, at *7 (D. Ariz. July 29, 2016) (explaining that the doctrine "holds the contract drafter to a good faith standard by requiring an interpretation of the contract that accounts for the parties' reasonable expectations") (citing *Darner*, 682 P.2d at 398-99).

Not long after *Darner*, the Arizona Supreme Court, in *Gordinier v. Aetna Casualty & Surety Co.*, 742 P.2d 277 (Ariz. 1987), identified a limited variety of situations in which Arizona courts "will not enforce even unambiguous boilerplate terms in standardized insurance contracts":

> 1. Where the contract terms, although not ambiguous to the court, cannot be understood by the reasonably intelligent consumer who might check on his or her rights, the court will interpret them in light of the objective, reasonable expectations of the average insured;

2.  Where the insured did not receive full and adequate notice of the term in question, and the provision is either unusual or unexpected, or one that emasculates apparent coverage;

3.  Where some activity which can be reasonably attributed to the insurer would create an objective impression of coverage in the mind of a reasonable insured;

4.  Where some activity reasonably attributable to the insurer has induced a particular insured reasonably to believe that he has coverage, although such coverage is expressly and unambiguously denied by the policy.

742 P.2d at 283-84 (citations omitted).

Because the first and second *Gordinier* situations focus on the expectations of an objectively reasonable insured and the policy language itself, Plaintiff contends, they are determined by the Court "as a matter of law." Doc. 73 at 10. Plaintiff further contends that nothing in the third and fourth situations justify open-ended discovery because "these circumstances merely involve external communications between the insurer and its insured." *Id.*

Defendants counter that the documents they seek regarding the sexual act exclusion – drafting history; advertising, sales, and underwriting materials; claims manuals; the subject claim file; and other claims involving the exclusion – are discoverable under the third and fourth *Gordinier* situations. Doc. 72 at 10. Specifically, Defendants argue that the requested documents are relevant to: (1) representations Plaintiff may have made to Dr. Gear regarding the scope of coverage and exclusions; (2) Plaintiff's knowledge of Dr. Gear's needs and desires in terms of coverage for his family practice; (3) Dr. Gear's assertion that he never would have purchased the policy had he been advised of Plaintiff's broad interpretation of the sexual act exclusion; and (4) whether Plaintiff believes an average physician would assent to purchasing a professional liability insurance policy that eliminates coverage for the negligent provision of otherwise covered professional services because the patient's condition arose from a sexual act (*i.e.*, pregnancy, sexually transmitted diseases, contraceptive care). *Id.* at 8-10; *see also* Doc. 75 at 5 (arguing that

9

1  Defendants "should be permitted to discover evidence regarding [Plaintiff's] creation and

2  application of a 'sexual acts' exclusion to bar coverage for a medical malpractice claim for

3  failure to diagnose and treat a pregnancy").

4        The Court agrees with Defendants. "Under *Darner*, relevant evidence regarding the

5  expectations of the parties includes more than explicit representations by the agent." *Do by*

6  *Minker*, 828 P.2d at 1257. *Darner* "made it clear that *all* circumstances should be taken

7  into account in determining the parties' understanding, including the assertions and

8  conduct of both insurer and insured." *Id.* (emphasis in original). Courts should consider

9  "evidence on surrounding circumstances, including negotiation, prior understandings,

10  subsequent conduct, and the like[.]" *Id.* (quoting *Darner*, 682 P.2d at 698); *see also*

11  *Averett*, 869 P.2d at 508 ("When an exclusion . . . runs contrary to what a reasonable

12  insured would expect, or when it significantly diminishes coverage that the policy purports

13  on its face to provide, the surrounding facts and circumstances must be considered to

14  determine whether, and to what extent, there was a meeting of the minds between the

15  contracting parties."); *Maricopa Cty.*, 2000 WL 35937314, at *5 ("[W]e conclude that the

16  trial court erred in refusing to consider the proffered interpretive materials relating to the

17  pollution exclusion. Those materials arguably 'illuminate the meaning of the contract

18  language' and allegedly demonstrate defendants' intent when the pollution exclusion was

19  proposed and approved.").

20        Plaintiff does not dispute that communications between Plaintiff and Dr. Gear are

21  discoverable under *Darner* and the reasonable expectations doctrine. *See* Doc. 73 at 10.

22  The drafting history of the sexual act exclusion, sales instructions, and claims manuals and

23  files also may be germane to the interpretation of the exclusion. *See Maricopa Cty.*, 2000

24  WL 35937314, at *7 (rejecting as incompatible with *Darner* the argument that drafting

25  history played no part in policy negotiations, and noting that the insured's lack of reliance

26  on "the interpretive materials when it purchased defendants' policies does not render the

27  materials irrelevant or unworthy of consideration"); *see also Homeland Ins. Co. of N.Y. v.*

28  *Goldstein*, No. 1:15-CV-00031-ABJ, 2019 WL 1506008, at *5 (D. Wyo. Apr. 5, 2019)

1   ("[T]he circumstances and events surrounding the formation of the Homeland insurance

2   policy is relevant to the issues presented in this Court. Powell is entitled to conduct

3   discovery of those events so that it may prepare and present its position to the Court as to

4   what if any extrinsic evidence should be considered . . . .   The underwriting files are

5   relevant to the issues presented in this case and as such are discoverable under Rule 26.");

6   *Martinez v. James River Ins. Co.*, No. 2:19-cv-01646-RFB-NJK, 2020 WL 1975371, at *3

7   (D. Nev. Apr. 24, 2020) ("The case law is well settled that claims manuals are generally

8   relevant and discoverable both for bad faith and breach of contract insurance claims.");

9   *Progressive Garden State Ins. Co. v. Metius*, No. CV 18-2893 (WJM), 2019 WL 1468155,

10   at *1 (D.N.J. Apr. 3, 2019) (finding drafting histories, underwriting manuals, claims

11   handling guidelines, and other insurance policies defining the relevant terms to be relevant

12   for discovery purposes);  *Rembrandt Enters., Inc. v. Illinois Union Ins. Co.*, No. 15-CV-

13   2913 (RHK/HB), 2016 WL 6997108, at *2 (D. Minn. Jan. 13, 2016) ("When a court will

14   be tasked with interpreting an insurance policy, 'documents regarding similar claims of

15   other insureds, the drafting history of a policy, and claims manuals,' for example, 'are

16   relevant and discoverable.'") (quoting *Mariner's Cove Site B Assocs. v. Travelers Indem.

17   Co.*, No. 04 CIV.1913 (KMW) (RLE), 2005 WL 1075400, at *1 (S.D.N.Y. May 2, 2005));

18   *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 891 (Cal. 1995) ("Most courts

19   and commentators have recognized . . . that the presence of standardized industry

20   provisions and the availability of interpretative literature are of considerable assistance in

21   determining coverage issues. . . .   [W]e find the drafting history relevant in evaluating

22   Admiral's [public policy] argument[.]"); *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135

23   F.R.D. 101, 106 (D.N.J. 1990) (finding "materials relating to the manner in which [the

24   insurers] have handled the claims of other insureds with identical policy language . . .

25   relevant for purposes of discovery since [the materials] may show that identical language

26   has been afforded various interpretations by the insurer [and] that the interpretations

27   suggested by the defendants today are not the same as those of the original drafters");

28   *Champion Int'l Corp. v. Liberty Mut. Ins. Co.*, 129 F.R.D. 63, 67-68 (S.D.N.Y. 1989) ("The

11

1    Court agrees that inquiries concerning the drafting history of the provisions in question,

2    how-to-sell instructions and claims manuals are clearly germane to the interpretation of

3    [the insurance] policies."); *Nat'l Union Fire Ins. Co. of Pitt., Pa. v. Stauffer Chem. Co.*,

4    558 A.2d 1091, 1095 (Del. Super. Ct. 1989) ("Stauffer seeks to discover interpretive

5    manuals and other insureds' claim files in order to see if ambiguities are present in the

6    policies.  This Court finds that the claim files and the interpretive materials are relevant to

7    the determination of ambiguity and should be the subject of discovery[.]").

8          Plaintiff's reliance on *DeTemple v. Southern Ins. Co.*, 740 P.2d 500 (Ariz. Ct. App.

9    1987), is misplaced.  Doc. 73 at 10.  That case involved the grant of summary judgment

10   where the insured "did not present evidence that [the agent] misled him into believing that

11   he had other than month-to-month coverage[,]" but instead based "his 'reasonable

12   expectations' on what he had told [the agent] and from reading a copy of the insurance

13   policy." 740 P.2d at 508.  The case did not involve the discovery of extrinsic evidence.

14         **C.    Ambiguity.**

15         In the absence of ambiguity, Plaintiff contends, a request for discovery concerning

16   the meaning of policy terms is without merit.  Doc. 73 at 6.  "But ambiguity need not exist

17   before courts may consider extrinsic evidence of the parties' intent." *N. Improvement Co.*

18   *v. United States*, 398 F. Supp. 3d 509, 520 (D. Ariz. 2019) (citing *Taylor*, 854 P.2d at 1140).

19   The Arizona Supreme Court "clearly has rejected 'the often repeated and usually over-

20   simplified construct that ambiguity must exist before parol evidence is admissible' and has

21   particularly 'criticized the ambiguity prerequisite in the context of non-negotiated

22   insurance agreements.'" *Maricopa Cty.*, 2000 WL 35937314, at *4 (quoting *Taylor*, 854

23   P.2d at 1140); *see also State Farm Mut. Auto. Ins. Co. v. Wilson*, 782 P.2d 727, 733 (Ariz.

24   1989) ("We once again decline 'to hold that an unexpected, unknown ambiguity in a clause

25   which the parties did not negotiate should permit them to show the true meaning of the

26   agreement, but that the lack of such an ambiguity prevents them from so doing.'") (quoting

27   *Darner*, 682 P.2d at 394).  As the *Taylor* court explained: "[T]he ambiguity determination

28   distracts the court from its primary objective – to enforce the contract as intended by the

1    parties.  Consequently, although relevant, contract ambiguity is not the only linchpin of a

2    court's decision to admit parol evidence."  854 P.2d at 1140; *see also McClure Enters.,*

3    *Inc. v. Gen. Ins. Co. of Am.*, No. CV 05-3491 PHX SMM, 2007 WL 2154033, at *4 (D.

4    Ariz. July 24, 2007) ("Although the court may not look to evidence that contradicts or

5    varies the meaning of an agreement, Arizona has adopted the 'Corbin approach,' which

6    allows the court to look at extrinsic evidence to determine the intent of the parties without

7    a preliminary finding of ambiguity.") (citing *Taylor*, 854 P.2d at 1139-40); *Greyhound*

8    *Lines Inc. v. Viad Corp.*, 260 F. Supp. 3d 1181, 1190 (D. Ariz. 2017) ("Arizona does not

9    adhere to the view 'that ambiguity must exist before parol evidence is admissible.'")

10   (quoting *Taylor*, 854 P.2d at 1140).[4]

11   **III.    Conclusion.**

12          During Phase 1 of this litigation, Defendants may, subject to other appropriate

13   objections, discover relevant extrinsic evidence regarding the meaning and application of

14   the sexual act exclusion, including drafting history; advertising, sales, and underwriting

15   materials; claims manuals; the subject claim file; and other claims involving the sexual act

16   exclusion.  The admissibility of any such evidence, and whether it should be considered in

17   interpreting the policy and sexual act exclusion, will be determined at the appropriate time.[5]

18          **IT IS SO ORDERED.**

19          Dated this 13th day of October, 2021.

20

21                                                        David G. Campbell
                                                          Senior United States District Judge
22

23          [4] Plaintiff notes that other courts have found valid and enforceable certain
     exclusions similar to the sexual act exclusion in this case.  Doc. 73 at 7-8 (citing *Am. Fam.*
24   *Mut. Ins. Co. v. Verdugo*, 691 F. App'x 387, 388 (9th Cir. 2017) ("physical or mental
     abuse" exclusion); *Travelers Indem. Co. of Am. v. Isom*, No. CV-13-00647-PHX-GMS,
25   2014 WL 1092542, at *2-3 (D. Ariz. Mar. 20, 2014) ("sexual molestation" exclusion)).  As
     Plaintiff acknowledges, however, the meaning of the sexual act exclusion should be
     determined, if appropriate, on summary judgment. *Id.* at 7.
26
            [5] Plaintiff asserts that the policy's merger and integration clause precludes all
27   discovery because "there is simply nothing [Defendants] could discover that would
     override the policy's express intent."  Doc. 73 at 9.  But Plaintiff cites no legal authority
28   suggesting that the clause alters Arizona's rules of contract interpretation, the reasonable
     expectations doctrine, or the discovery of extrinsic evidence in this context. *See* Doc. 75
     at 4.